# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| "Q"-LUNGIAN ENTERPRISES, INC., *et al.*, <br>    *Plaintiffs*, | |
| v. | No. 3:13-cv-01285 (JAM) |
| TOWN OF WINDSOR LOCKS, *et al.*, <br>    *Defendants*. | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Nude dancing is expressive activity that qualifies for protection as "free speech" under the First Amendment to the U.S. Constitution. The plaintiffs in this lawsuit ran a billiards bar and restaurant known as "Pool Table Magic" in the Town of Windsor Locks, Connecticut. They wanted to expand their business to include topless female dancers. But the Town denied them a zoning permit. So plaintiffs sued on grounds that the Town's zoning code violates the First Amendment.

I will now dismiss this action for two reasons. First, plaintiffs don't have standing. For a plaintiff to have standing to maintain an action in a federal court, a plaintiff must not only prove an injury caused by a defendant but also that a court ruling in the plaintiff's favor would redress that injury. Although plaintiffs here have sued the Town to challenge its zoning code, they have not challenged a separate state regulation that prohibits them as a liquor licensee from employing or using female topless dancers. Even if I ruled for plaintiffs that the local zoning code violated their First Amendment rights, plaintiffs would still have remained subject to the state liquor regulation, and my ruling would not redress plaintiffs' claim of injury.

Second, the Town's zoning code did not violate plaintiffs' rights under the First Amendment. Because the zoning code is not a content-based regulation of expressive activity, it

1

is not presumptively invalid under the First Amendment. Nor is it a verboten prior restraint on speech. To the extent that the Town's zoning code affected plaintiffs' plans at all to engage in expressive activities, it operated as a valid time-place-and-manner regulation with reasonable criteria and allowance for alternative avenues for free expression. The Town did not violate the First Amendment.

<b><small>BACKGROUND</small></b>

In 1993, the Town of Windsor Locks adopted an adult-oriented establishment ordinance. Doc. #54-9. The preamble to this ordinance notes that "there are a number of 'adult oriented establishments' located in the Town of Windsor Locks which require special supervision from the Town's public safety agencies in order to protect and preserve the health, safety and welfare of the patrons of such establishments, as well as the health, safety and welfare of the Town's citizens." *Id.* at 3. The preamble recites public health and safety concerns relating to such adult businesses, including that such establishments may encourage prostitution and cause health problems from the deposit of human bodily fluids in publicly accessible locations. *Id.* at 3-4. The ordinance goes on to note that it is not the Town's intent to deny any person the right to free speech as protected by the federal and state constitutions. *Id.* at 4.

The 1993 ordinance defines an "adult-oriented establishment" to include in relevant part an adult entertainment venue that features live performances by topless women. *Id.* at 6-7. Among other regulations, the ordinance prohibits all adult entertainment establishments from being located within 500 feet of a residential zone or 1000 feet of a public park or playground. *Id.* at 8. The parties do not dispute that at the time of the events at issue in this case the Town

required that any such adult-oriented establishments be located in a B-1 (business) zoning district.[1]

Apart from this adult business ordinance, the Town was also governed at the relevant time by a general and comprehensive zoning code. As of October 2012, the operative form of the zoning code was the 2009 printing, subject to a few 2011 amendments not relevant to this case. Section 402 of this code contained tables listing in detail both the permitted and prohibited uses of land in each type of zoning district. Doc. #52-4 at 2-10. Section 401 of the code explained the various abbreviations that appear in these tables. Uses marked "SP" were permitted uses that were subject to site plan and design review. Doc. #52-4 at 1. Uses marked "SU" were permitted uses that were subject to a further requirement of obtaining a special use permit. *Ibid.* Approval for "SP" and "SU" uses required a meeting of the Planning and Zoning Commission (PZC), and this approval was subject to conditions set out in § 1102 and § 1103 of the code. *See ibid.*; Doc. #52-5 at 1-2.

In contrast to uses marked as "SP" or "SU", uses marked "P" in the zoning code were permitted without review by the PZC, and their approval required only the ministerial issuance of a building permit.[2] Uses marked "X" were prohibited outright, as was any use not enumerated in the code, unless the PZC determined that it was "sufficiently similar to a listed use." Doc. #52-4 at 1. In addition, section 402A also listed certain permitted "accessory" uses, including any "accessory use customary with and incidental to a permitted use on the same lot." Doc. #52-7 at 12.

---

[1] Doc. #66 at 7 (plaintiffs' admission that "adult uses are currently allowed in the Town of Windsor Lock's Industrial-1 Zone and were allowed in the B-1 Zones at the time of the plaintiffs' application"). In light of plaintiffs' admission in their Local Rule 56(a)(2) Statement that adult uses were permitted in the B-1 zones at the time of their application, I reject the contrary argument in their briefing. *See* Doc. #70 at 2.

[2] The only use marked "P" seems to have been single-family dwellings in residential zones. Doc. #52-4 at 2-5.

In short, the Town's general zoning code specified a range of permitted and unpermitted uses. Adult entertainment was not mentioned anywhere in the general zoning code. Only the specific 1993 ordinance regulated these establishments by name.

In 1988, Mark Kulungian first opened a billiards hall known as Pool Table Magic in Enfield, Connecticut. Doc. #52-2 at 9. Pool Table Magic moved to its current location in 2004 at 75 Ella Grasso Boulevard in Windsor Locks. *Ibid*; Doc. #52-2 at 10-11. This location is within a B-1 zoning district, and it is not within 500 feet of a residential district or 1000 feet of a recreational area. Doc. #52-1 at 14. Accordingly, there is no indication in the record before me that the Town's adult business ordinance would prohibit Pool Table Magic from engaging in adult-business oriented activity.

The two plaintiffs in this case are two companies connected to Kulungian and the Pool Table Magic business. Plaintiff "Q"-Lungian Enterprises, Inc., operates Pool Table Magic, and it is a tenant of the property at 75 Ella Grasso Boulevard that is owned by co-plaintiff Jessie James Realty, LLC.

On October 12, 2012, Kulungian submitted an application to the PZC for a site plan modification and for zoning approval to add "live entertainment which would include, but not be limited to, exotic [i.e. topless] dancers" at Pool Table Magic. Doc. #52-1 at 6-7. His application stated that "the proposed accessory use of live entertainment is customary with and incidental to the permitted use as a restaurant." *Id.* at 7.

On February 7, 2013, the PZC rejected this application, and a week later sent a letter to Kulungian stating that "the proposed accessory use is not a customary use with a restaurant or a restaurant use and is not a listed use on the Permitted Use Tables of Section 402." Doc. #52-1 at 29. However, the letter suggested that "the newly proposed accessory use for the building might

be considered similar to an amusement enterprise or an assembly hall use, and therefore an application for site plan modification and a special use permit should be submitted." *Ibid.*

Kulungian followed up by submitting a new application on March 5, 2013, seeking a site plan modification and special use permit for the same exotic dancing proposal as in his previous application. *Id*. at 31-32. This application was also denied by the PZC on August 12, 2013. The PZC wrote a letter to Kulungian stating that the application was rejected "due to the failure of the application to offer any evidence showing the proposed use was permitted under the amusement enterprise provision." *Id.* at 47.

Plaintiffs then sued. On September 3, 2013, plaintiffs filed this complaint alleging that their First Amendment rights had been violated. Doc. #1. The complaint advances three different theories of First Amendment violations, somewhat confusingly styled as separate "counts" or "causes of action" of the complaint. First, the complaint alleges that the requirement of the zoning code that plaintiffs apply for a special use permit is an unconstitutional prior restraint on protected speech. Doc. #1-1 at 12-13. Second, the complaint alleges that the zoning code acts as an unconstitutional restriction on where plaintiffs may engage in live entertainment and does not allow for alternative avenues of communication, as required by the United States Supreme Court in *City of Renton v. Playtime Theaters*, 475 U.S. 50 (1984). Doc. #1-1 at 13-15. Third, the complaint alleges that the zoning code impermissibly "zones out" plaintiffs' proposed entertainment use, because it prohibits all forms of live entertainment except for dramatic and musical productions. *Id.* at 15-17. This third "count" also cites *Renton*, and it seems to serve as a catch-all for a number of mini-theories of First Amendment violation: that the regulations were a content-based restriction on speech, that they were overbroad, that they were not narrowly tailored, that they were not necessary to a compelling government interest, and that they

impermissibly restricted people's ability to engage in live entertainment or other First Amendment-protected activities within Windsor Locks. *Id*. at 15-17. A fourth "count" in the complaint is framed as an administrative appeal of the PZC's decision under state law. Both sides have moved for summary judgment on the first three First Amendment "counts" of the complaint.

**DISCUSSION**

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). My role at the summary judgment stage is to decide if there are enough facts in dispute to warrant a trial. Of course, I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then to decide if those facts would be enough—if eventually proved at trial—to allow a jury to decide the case in favor of the opposing party. If the facts do not rise to the level that would allow a reasonable jury to rule in the opposing party's favor, then there is no point in allowing the lawsuit to proceed, and the motion for summary judgment will be granted. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Standing*

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. From this requirement that there be an actual "case" or "controversy" for a court to resolves comes the principle that any plaintiff in a federal court must have "standing" to assert his or her claim—specifically, a plaintiff must show (1) an

injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. See *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449–50 (2d Cir. 2014). Moreover, even if the parties themselves have failed to raise the issue, the Court must dismiss an action if it discovers at any time during the litigation that the plaintiff lacks standing. *See* Fed. R. Civ. P. 12(h)(3); *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015).

Here it is readily apparent that plaintiffs lack standing. Although plaintiffs have challenged the failure of the Town's zoning code to allow them to host topless dancing activities, they have not challenged a cognate regulation of the State of Connecticut that independently precludes them as liquor license permittees from engaging in the same conduct. At the relevant times in this case, Pool Table Magic had a permit to sell alcohol that was issued under the State of Connecticut's Liquor Control Act, Conn. Gen. Stat. § 30-74. A Connecticut liquor regulation in turn prohibits any person from being employed or otherwise used on such premises holding a liquor permit while such person is "unclothed or in such attire, costume or clothing as to expose to view any portion of the female breast below the top of the areola. . . ." R.C.S.A. § 30-6-A24(b); *see also Inturri v. Healy*, 426 F. Supp. 543, 549 (D. Conn. 1977) (three-judge court decision upholding this regulation against challenge under the First Amendment and Equal Protection Clause).

If a plaintiff challenges a law that forbids certain conduct when that very same conduct is also prohibited by a separate law that the plaintiff has *not* challenged, then a plaintiff lacks standing. A court cannot provide any meaningful relief to such a plaintiff, because—regardless of the outcome of the plaintiff's challenge to the first law—the plaintiff will remain subject to the

prohibition of the second law that has not been challenged. Numerous courts have concluded in like circumstances that standing is lacking because any grant of relief would not redress the claim of injury suffered. *See, e.g.*, *Mercer Outdoor Advert., LLC v. City of Hermitage, Penn.*, 605 F. App'x 130, 132 & n.2 (3d Cir. 2015); *White v. United* States, 601 F.3d 545, 552 (6th Cir. 2010); *Maverick Media Group, Inc. v. Hillsborough County, Fla.*, 528 F.3d 817, 820-23 (11th Cir. 2008) (*per curiam*); *Midwest Media Property, L.L.C. v. Symmes Tp., Ohio*, 503 F.3d 456, 461-62 (6th Cir. 2007); *Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421, 430 (4th Cir. 2007).

Following this approach, I conclude that plaintiffs here lack standing to challenge the Windsor Locks zoning code. Even if I ruled for plaintiffs that the Town's zoning code violates the First Amendment, plaintiffs' proposed conduct would still have been illegal under R.C.S.A. § 30-6-A24(b), and any relief I might order would not redress plaintiffs' injury.[3]

As this case has been pending for many years and may be subject to further review, I will also, for the sake of judicial economy, address the merits of plaintiffs' First Amendment claims. I conclude those claims are without merit, and this conclusion forms an alternate basis for my ruling dismissing this case.

### *The First Amendment*

The First Amendment provides in relevant part that Congress may make no law that abridges the freedom of speech. U.S. Const. Amend. I. The protections of the First Amendment of course have long been applicable by incorporation under the Fourteenth Amendment against

---

[3] The parties' briefing discusses the state liquor regulation but without appreciating its significance as to the issue of whether plaintiffs have standing to maintain this lawsuit in a federal court. Instead, the parties discuss whether the PZC was authorized to deny plaintiffs' permit application on the ground that the proposed activity would independently violate state law. *See* Doc. #54-1 at 28-29; Doc. #65 at 18-20. I need not resolve the scope of the PZC's authority, because—regardless of the answer to that question—the very existence of the independent and unchallenged state law bar on plaintiffs' proposed activity precludes plaintiffs' standing to maintain their lawsuit in federal court.

the States and their localities such as Windsor Locks. *See* U.S. Const. XIV; *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940).

When a court is faced with a First Amendment challenge to a law that regulates expressive conduct, the court must decide at the outset what standard of review to apply (*i.e.*, how strong the governmental interest must be and how strongly the government must show that its interest is appropriately served by the law without incidental impact on protected speech activity). The Supreme Court has long made clear that when the government regulates expressive activity on the basis of its content, then the law is subject to the most demanding "strict" form of scrutiny. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). By contrast, when regulations affect speech but are unrelated to the content of speech, then they are subject instead to some form of less demanding "intermediate" scrutiny. *Ibid.*; *see generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267 (2007).

### Strict Scrutiny

Plaintiffs contend that the Town has engaged in content-based regulation of their right to engage in topless dancing entertainment. I do not agree. In view of the government's interest in limiting the secondary effects on communities of adult-oriented businesses, the Supreme Court has long rejected the argument that the regulation of adult-oriented businesses amounts to content-based regulation that warrants the application of strict scrutiny. *See, e.g.*, *Young v. American Mini-Theatres, Inc.*, 427 U.S. 50, 70 (1976); *Renton*, 475 U.S. at 46-49. True enough, the notion that a law that targets adult-oriented speech is not content-based may well be "something of a fiction." *See Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448-49 (2002) (Kennedy, J., concurring). And the Supreme Court has more recently ruled in a quite different context that the determination of whether a regulation is content-based should be based solely on

whether the regulation *on its face* classifies on the basis of content (and presumably to the exclusion of the consideration of secondary effects). *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).

Nevertheless, *Young* and *Renton* remain good law. It is not for me to repudiate these decisions by ruling that the regulation of adult-oriented businesses amounts to content-based regulation and warrants the application of strict scrutiny. *See, e.g.*, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 & n.1 (7th Cir. 2015) (noting that "as long as one purpose of the ordinance is to combat harmful secondary effects, the ordinance is regarded as content neutral (despite the legal fiction) and thus intermediate scrutiny applies" and that "we don't think *Reed* [*v. Town of Gilbert*] upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category [of speech] the Court has said regulates the outer fringes of First Amendment protection"); *see also Flanigan's Enterprises, Inc. of Georgia*, 2017 WL 3475481, at *5-6 (11th Cir. 2017) (*per curiam*) (same); *Free Speech Coal., Inc. v. Attorney Gen. United States,* 825 F.3d 149, 160-64 (3d Cir. 2016) (same); Ashutosh Bhagwat, *In Defense of Content Regulation*, 102 Iowa L. Rev. 1427, 1441-44 (2017) (surveying cases in this area and suggesting that the Supreme Court should revisit this issue).

In any event, plaintiffs err in their assertion that the zoning code discriminates at all against "adult" uses. As plaintiffs note, the zoning code makes (or rather made, until amendments enacted during the course of this lawsuit) no reference whatsoever to "adult" or sexually-oriented establishments. But the 1993 ordinance does. It is precisely the type of "adult establishment" ordinance reviewed in *Young* and *Renton* and *Alameda Books*.[4] And the presence

---

[4] Indeed, the similarities between the 1993 ordinance and those at issue in *Renton* and *American Mini Theatres* are so striking that they would all seem to come from some common model or template. Like the *Renton* ordinance, the Windsor Locks ordinance bans adult establishments within a certain distance of certain other kinds of

of this *Renton*-style "adult"-specific ordinance makes the general zoning code's content-neutrality clear.

As I see it, viewing the general zoning code and the specific "adult" ordinance as a whole, the Town's regulations see a business's "adult" orientation as an independent characteristic, wholly separate from its categorization under the general zoning code. That is to say, when the general zoning code refers to "Theaters for indoor motion picture projection or dramatic or musical productions," Doc. #52-4 at 3, it draws no distinction between "adult" theaters and "regular" ones. If a regular theater would be permitted in a certain district, so would an adult one—subject, of course, to the constraints of the specific adult entertainment ordinance.

These are two separate sets of regulations that operate along different axes. The adult entertainment ordinance specifically prohibits adult establishments in certain parts of town. Plaintiffs have not, however, challenged this ordinance, no doubt because it does nothing to prohibit an adult-oriented establishment at the location of plaintiffs' property. *See* Doc. #52-1 at 39. Meanwhile, the general zoning code requires that all land use in each part of town, adult or otherwise, take certain forms. Adult uses are permitted if they take a permitted form, and not otherwise. For instance, an adult theater would be permitted in a B-1 Zone, subject to the requirement of submitting a site plan, but would not be permitted in a Residential AA Zone. *See* Doc. #52-4 at 3. Even under *Reed*, this is a genuinely facially content-neutral regulation, not merely content-neutral in the slightly fictitious *Renton* sense.

Nor is the Supreme Court's decision in *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981) to the contrary. That case invalidated a local zoning ordinance that did not include live entertainment—including nude dancing—among its "permitted" uses and that had been

_____

establishments. And its definition of "adult" entertainment is word for word identical to the ordinance reviewed (and upheld) in *American Mini Theatres*. *Compare* Doc. #54-9 at 5-7, *American Mini Theatres,* 427 U.S. at 53, 53 n.4.

previously interpreted by state courts to preclude any live entertainment. The *Schad* decision is distinguishable from this case, because there is no evidence that live entertainment in general or nude dancing in particular was categorically prohibited in Windsor Locks.

### *Prior Restraint*

Plaintiffs next argue for strict scrutiny, or something like it, on the ground that the zoning code's requirement that they apply for a permit to engage in topless dancing constitutes an unconstitutional system of prior restraint. Doc. #1-1 at 12-13. A "prior restraint," which the Supreme Court has termed the "core abuse against which [the First Amendment] was directed," *Thomas v. Chicago Park District*, 534 U.S. 316, 320 (2002), means any law requiring would-be speakers to seek government approval *before* speaking. For at least two reasons, prior restraint schemes "present[] peculiar dangers to constitutionally protected speech," *Freedman v. Maryland*, 380 U.S. 51, 57 (1965). First, "because the censor's business is to censor, there inheres the danger that he may well be less responsive than a court . . . to the constitutionally protected interests in free expression." *Id*. at 57-58. Second, the requirement that approval be obtained before expressive activity can take place means that a would-be speaker must wait while an application to the censor is being processed. See *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.") (citing Alexander Bickel, *The Morality of Consent* 61 (1975)).

Accordingly, the Supreme Court has held that the First Amendment requires any scheme of prior restraint to follow certain procedural guidelines designed to ensure swift judicial review wherein the censor's determination regarding the permissibility of the speech in question is not given conclusive weight. *See Freedman*, 380 U.S. at 58-59. The Court has also held that

licensing schemes cannot make "the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official," but must contain "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969).

In light of all this, plaintiffs argue that the Town zoning code is a system of prior restraint and that it does not meet the stringent requirements imposed by the First Amendment on any such system. Specifically plaintiffs claim that the code "vest[s] government officials with unbridled discretion" to permit or forbid expression, and therefore violates the *Shuttlesworth* requirement that prior restraint or licensing schemes contain narrow, objective, and definite standards. Doc. #52 at 14-17.

Plaintiffs are correct that a zoning scheme such as this one does bear many of the hallmarks of an improper system of prior restraint. The zoning code lists only a few uses that are simply "permitted." (As noted above, it appears that only single-family dwellings in residential zones are listed as "permitted.") All other uses, if they are permitted at all, must be submitted to the PZC before they can proceed; this is precisely the structure of a prior restraint. The category of uses subject to this discretionary prior restraint is effectively limitless, since under § 401 it includes not only the uses listed as permitted conditional on site plan approval or the issuance of a special use permit but also all uses *not* listed in the zoning code. And at least one federal appeals court has held that a zoning scheme similar to this one, which required for many different proposed uses, including some "adult" ones, that there be an application for zoning "exceptions" from the zoning board, was an improper system of prior restraint. *See Lady J. Lingerie, Inc. v. Jacksonville*, 176 F.3d 1358, 1361-63 (11th Cir. 1999).

Still, I am not persuaded by this reasoning, because a general zoning code differs from a typical prior restraint edict in several important ways. For one thing, the practical concerns that make prior restraint of speech particularly odious do not apply in the land use context. As noted, one of the chief harms of prior restraint is the delay it imposes even upon speech ultimately found to be permissible. But with land use, a prior restraint/licensing system is in property owners' own interest. If adjudication of the zoning code were left to an *ex post* enforcement action, would-be builders would not know whether their projects were legal before they spent considerable resources building them. Either this would result in a strong chilling effect, with projects of even questionable permissibility never being built at all, or it would result in considerable wasteful expenditure of resources on the construction of buildings that turn out to have been forbidden and now must be torn down.

Even more significant is the fact that the zoning laws do not apply specifically to expressive activity. They cover all potential land use including residential, commercial, and industrial uses many or perhaps most of which do not involve speech or expression. This means that the other chief worry about prior restraint, that "the censor's business is to censor," *Freedman*, 380 U.S. at 57, and that therefore the licensing scheme will systemically undervalue First Amendment interests, is not especially relevant. A zoning board's business is not, in fact, to censor unprotected and undesirable speech; it is to regulate land use. What's more, because the zoning code is not itself concerned with expression or with the character of expressive activity, unlike the motion picture codes considered in *Freedman*, it is hard to see how the *Freedman* requirement that the censor bear "the burden of proving that the [speech] is unprotected expression," 380 U.S. at 58, could possibly apply.

Most significantly of all, the Supreme Court has made clear that a prior-permitting scheme that does not depend upon the content of speech is not subject to strict scrutiny like other forms of prior restraints. *See Thomas v. Chicago Park District*, 534 U.S. 316 (2002). That case considered an ordinance requiring any public gathering of 50 or more people in a Chicago public park to apply for a permit. *Id*. at 318. This was challenged by the would-be organizers of rallies advocating the legalization of marijuana as a prior restraint invalid under *Freedman*. *Id*. at 319. The Court held that:

> *Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum. The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park. The picnicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded. And the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.

*Id*. at 322.

Although the parties do not focus on *Chicago Park District*, its reasoning applies, point by point, to this case. The Town's zoning code does not authorize the PZC to pass judgment on the content of speech. None of the grounds for granting or denying a building permit has anything to do with what a speaker might say. The zoning code is not even directed to communicative activity as such, but rather to *all* land use within the town of Windsor Locks. The funeral home and gas station, no less than the movie theater or political club, must apply for a permit to operate in a B-1 district. And the object of the zoning code, as plainly indicated by the criteria for judging permit applications, is not to exclude communication of a particular content,

but to coordinate multiple uses of the town's limited space, to implement the town's urban planning policies, to prevent uses that are dangerous, unlawful, or a nuisance to other nearby activities, and to assure preservation of the town's aesthetic values.[5] *See BBL, Inc.*, 809 F.3d at 324 (noting that "what remains is the City's preexisting zoning rule that all property owners seeking to make any change of land use must secure an Improvement Location Permit" and that "because this requirement is generally applicable and doesn't discriminate based on the content of speech, it lacks a 'close enough nexus to expression' for us to entertain a facial challenge under the First Amendment").

Accordingly, as the Supreme Court did in *Chicago Park District*, I conclude that the zoning code here is not a prior restraint law governed by *Freedman* and *Shuttlesworth*, but rather that it is a content-neutral time, place, and manner restriction that is subject only to intermediate scrutiny. *See Chicago Park District*, 534 U.S. at 323-25. Insofar as the Eleventh Circuit's ruling in *Lady J. Lingerie* or the other district court cases cited by plaintiff suggest a different result, they are not persuasive because they predate and are inconsistent with the Supreme Court's decision in *Chicago Park District*.

### Intermediate Scrutiny

Of course, as the Supreme Court stated in *Chicago Park District*, the fact that the zoning code is a content-neutral time, place, and manner regulation does not mean that it is wholly immune to judicial review. Because even such a regulation "can be applied in such a manner as to stifle free expression," the Constitution requires that it "contain adequate standards to guide

---

[5] It might seem that preserving aesthetic values should be an impermissible government interest under the First Amendment, since it involves making essentially artistic judgments and imposing those judgments on dissenting voices. Certainly the state could not forbid the display or sale by art galleries of art declared to have poor aesthetics. Both the Supreme Court and the Second Circuit have held, however, that preservation of aesthetic values is a legitimate government interest in the zoning context. *See Lusk v. Village of Cold Spring*, 475 F.3d 480, 491 (2d Cir. 2007) (citing *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984)).

the official's decision and render it subject to effective judicial review." *Chicago Park District*, 534 U.S. at 323. The Sixth Circuit has described the *Chicago Park District* test for time, place, and manner regulations as requiring "that an ordinance (1) must contain adequate standards to guide the official's decision, (2) must not be based on the content of the message, (3) must be narrowly tailored to serve a significant government interest, and (4) must leave open ample alternatives for communication." *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009); *see also Lusk v. Village of Cold Spring*, 475 F.3d 480, 493 (2d Cir. 2007) (using similar language to describe the test for time, place, and manner regulations). The zoning code here satisfies all four elements of this test, though all four are worthy of discussion.

*1. Adequate Standards to Guide the Official's Discretion*

This first element is arguably the closest question of the four. Under *Chicago Park District*, any standards for granting or denying permit applications in the zoning code must be "narrowly drawn, reasonable, and definite" enough to guide the PZC's discretion. 534 U.S. at 324. The relevant sets of standards for this analysis are contained in Section 1103(A) of the code, governing the issuance of special use permits, Section 401 of the code, governing the PZC's finding that a non-listed use is "sufficiently similar" to a listed use, and Section 402A of the code, detailing permitted accessory uses.[6]

Section 1103(A)(1) provides that "all special permit uses . . . are declared to possess characteristics of such unique and distinct form that each special use shall be considered as an individual case." Doc. #52-5 at 1. Section 1103(A)(4) provides the standards by which the PZC shall conduct this case-by-case evaluation. Section 1103(A)(4)(a) requires that the location, size,

---

[6] Section 1103(B), which governs site plan approval, states only that "the Commission shall determine that the requirements of the Zoning Regulations are met." Doc. #52-5 at 1. This adds no independent content to the zoning code, and is therefore unworthy of independent analysis.

and nature of the proposed use be "in harmony with the appropriate and orderly development of the district in which it is located." *Ibid*. Section 1103(A)(4)(b) requires that any structures or landscaping on the lot "will not hinder or discourage the appropriate development and use of adjacent properties." *Ibid*. Finally, Section 1103(A)(4)(c) requires adequate parking and loading facilities, and that driveways be "laid out so as to achieve maximum safety." *Ibid*. Section 1103(A)(4) also states that the Commission may "attach specific conditions to the approval of a special use permit, if in its opinion, such conditions are essential" to a finding that these criteria would be met. *Ibid*.

Section 401 also states that:

The Commission may determine that a use that is not expressly prohibited is a similar use in a given district and that it will otherwise be in harmony with permitted uses in the zone; and that granting permission for such use will be subject to the same procedures as the comparable similar use; and provided further that the Commission may make the granting of such permission subject to such conditions as it may determine to be necessary for the protection of the health, safety, and general welfare of the public.

Doc. #52-4 at 1. Finally, Section 402(A) declares any "accessory use customary with and incidental to a permitted use on the same lot, subject to all other special conditions contained in these regulations" to be a permitted accessory use in any type of zoning district. Doc. #52-7 at 12.

At first glance several of these standards might seem fairly subjective or amorphous. Both Section 1103(A)(4)(a) and Section 401 require that proposed uses be "in harmony" with the district. Nothing in the code appears to elaborate on the requirement that any non-listed use be "sufficiently similar" to a listed use. Nor does anything in the code elaborate on the Section 402A definition of proposed accessory uses as those "customary with and incidental to" a permitted use. The PZC's power to impose conditions on the grant either of any special use

permit or on a finding of "sufficient similarity" might also seem troubling, particularly the Section 401 authority to impose any conditions thought necessary to protect the "health, safety, and general welfare of the public."

I conclude, though, that all of these standards are sufficiently definite to guide the PZC's discretion, in light of the decisions both of the Supreme Court and the Second Circuit. In *Chicago Park District* itself, the Supreme Court upheld standards for denying permits that included as a criterion "when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees." 534 U.S. at 324. This is not necessarily any more narrowly drawn or definite than any of the standards at issue in this case. It particularly resembles the standard for imposing conditions on similar uses under Section 401, which is arguably the broadest of the provisions at issue.

To the extent that the PZC has power to review whether proposed uses are "in harmony" with the district in which they are located, this is consistent with criteria upheld in *Lusk v. Village of Cold Spring*, 475 F.3d 480 (2d Cir. 2007). In that case, the Second Circuit upheld standards imposed by a village ordinance governing the posting of signs. *Id*. at 493-96.[7] The ordinance in *Lusk* required the review board to consider the following criteria:

> (a) The general design, character and appropriateness to the property of the proposed alteration or new construction;
> (b) The scale of proposed alteration or new construction in relation to the property itself, surrounding properties, and the neighborhood;
> (c) Texture and materials, and their relation to similar features of the properties in the neighborhood;
> (d) Visual compatibility with surrounding properties, including proportion of the property's front facade, proportion and arrangement of windows and other openings within the facade and roof shape; and
> (e) The importance of architectural or other features to the historic significance of the property.

---

[7] The Court also held on separate grounds that the method of enforcing the ordinance was unconstitutional. 475 F.3d at 491-93.

*Id.* at 494. The Second Circuit upheld these criteria despite their "subjective" nature, since it "doubt[ed] that a municipality could maintain a reasonable level of architectural homogeneity or historical fidelity—both of which are proper governmental purposes—in the absence of judgments that are partly subjective." *Id.* at 495. The ordinance criteria were "sufficiently tied to objective aesthetic standards . . . to provide the necessary guidance to the licensor." *Ibid.*

The consideration in *Lusk* of "appropriateness to the property" mirrors the Section 402A requirement that accessory uses be "customary with and incidental to" the existing permitted use. The requirement of "visual compatibility with surrounding properties" in *Lusk* mirrors the requirement, in both Section 401 and Section 1103(A), that the proposed use be "in harmony" with the rest of the district. Nothing in the *Lusk* criteria precisely mirrors the determination that a non-listed use is "sufficiently similar" to a permitted use, but it is clear to me that figuring out whether some proposed use is "sufficiently similar" to, say, an amusement enterprise is no less subjective or open-ended a judgment than "the importance of architectural or other features to the historical significance of the property," an additional criteria approved in *Lusk*. Overall, the Town's regulations set forth sufficient specific criteria to guide what must necessarily be a subjective aesthetic and architectural judgment. I therefore conclude that, under *Chicago Park District* and *Lusk*, the Town's zoning code contains adequate standards to guide the discretion of the PZC.

*2. Not Content Based*

I have already concluded above that the challenged provisions of the zoning code are not content-based. Accordingly, this element of the time-place-and-manner test is satisfied here.

*3. Narrowly Tailored to Serve Significant Government Interest*

It is clear that the Town's zoning code is designed to advance a significant government interest. Courts have unanimously held that the aesthetic interests protected by zoning laws are legitimate and substantial government interests. *See, e.g.*, *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."). This zoning code also seems concerned with town planning, fostering "appropriate and orderly development" of the town, and protecting the "health, safety, and general welfare of the public," all of which are also clearly significant government interests. *See generally Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 386-95 (1926).

Less clear is how the requirement of narrow tailoring should apply in the zoning context. But I am guided here by the Sixth Circuit's decision in *H.D.V.-Greektown*. There, the court rejected an argument that a sign ordinance was not narrowly tailored to advancing the city of Detroit's legitimate aesthetic interests because it did not "specifically identify the grounds on which the [board] may deny an application." 568 U.S. at 624. Instead, it adopted the narrowing construction proffered by the city, that "the ordinances permit the denial of a permit only on the grounds outlined therein." *Ibid*. Here it is clear to me that the criteria in different parts of the zoning code, from Section 401 to Section 402A to Section 1103, are the only standards that govern the PZC's decision whether to grant or reject a permit application. Therefore, following the *H.D.V.-Greektown* decision, I find that the zoning code's provisions are narrowly tailored to advancing the Town's significant aesthetic and town planning interests.

*4. Ample Alternatives for Communication*

Finally I must consider whether the zoning code leaves plaintiffs ample alternatives to communicate their chosen message. This has been a source of considerable confusion in this case. Plaintiffs and defendants alike have disputed at great length whether the regulations leave adequate alternative locations where plaintiffs might have opened their proposed topless dancing business. *See* Doc. #54-1 at 18-27, Doc. #65 at 5-11. As both parties' citations to numerous cases make clear, this is how the battle lines are typically drawn on the "ample alternatives" element in ordinary *Renton*-style cases. But this is not really a *Renton* case at all. *Renton*, and other such cases, concerned regulations of the *places* in which "adult" businesses could operate. Windsor Locks has such a "place" regulation, the 1993 ordinance, which is not challenged in this case and which did nothing to prohibit "adult" businesses on the plaintiffs' very own property. Were that ordinance to be challenged, defendants' observation that there were some 393 acres within the B-1 zone, Doc. #54-1 at 27, and plaintiffs' surveyor's conclusion that some 75 different locations within the town met the requirements of the 1993 ordinance, Doc. #52-1 at 17-20, would be germane to determining whether the 1993 ordinance leaves adequate alternative channels for communication.

But that is not this case, and it makes no sense to apply this sort of analysis to the facts in this case. Defendants argue, for example, that there were adequate alternative avenues for communication because "when the plaintiff submitted his proposal to the PZC, an adult use was permitted in the B-1 Zone (plaintiffs' zone)." Doc. #54-1 at 23. But what can it possibly mean to say that one of plaintiffs' "alternative" avenues of communication was their own property? That is hardly an *alternative* avenue, and besides, if the claim is that plaintiffs would have been

allowed to operate their proposed business at these so-called alternative sites, why weren't they? Defendants' argument is not even wrong, it is beside the point.

The zoning code is not a regulation of the *places* where adult businesses may operate but of the *manners* in which they may operate in different places. As I explained above, viewing the town's regulations as a whole it is clear that an "adult" business may legally operate if and only if it (i) is located in an area permitted by the 1993 ordinance; and (ii) takes the form of some permitted use in its location, as set forth in the general zoning code, *e.g.*, a motion picture theater in a B-1 district (subject to site plan review). Doc. #52-4 at 6. Plaintiffs' proposed use, according to the PZC, violated only the second restriction. In other words, it lacked a permissible manner, though it would have been located in a permissible place.

In order to evaluate whether plaintiffs were left with adequate alternative channels of communication, therefore, I must ask what alternate *manners*, or forms, of communication were available to them, not what alternate places were available. Because plaintiffs' lot is located in a B-1 district, which was the only type of district in which "adult" uses were permitted under the 1993 ordinance, the question becomes what possible forms "adult" entertainment could have taken in a B-1 ordinance under the regulations as of 2013. Turning to the zoning regulations I observe that the following uses were permitted in a B-1 zone subject only to the requirement of site plan approval: non-profit philanthropic, educational, and religious use; retail stores; restaurants; theaters; laundromats; and business offices. Additionally, the following uses were permitted in a B-1 zone subject to the requirement of a special use permit: multi-family dwellings; non-profit clubs; hotels; amusement enterprises; outdoor recreation areas; package stores; gas stations; funeral homes; gambling enterprises; car dealerships; car washes; fire stations; hospitals; and banquet facilities or conference centers. Doc. #52-4 at 6-10.

Most of these are not plausible forms that "adult" entertainment could take, or at the very least it would take a more active imagination than mine to see how they could be. Nonetheless, it does seem that just about every standard form that "adult" entertainment might take is provided for. Theaters are expressly permitted. Adult bookstores would seemingly qualify as retail stores. Somewhat less clear is whether something like a strip club, or a club featuring exotic dancing, would qualify as an "amusement enterprise similar to an assembly hall, bowling center, billiard or pool room," Doc. #52-4 at 7. The question would seem to turn on how seriously the list of examples is meant, and it is worth noting that the PZC's letter of February 15, 2013, did suggest that plaintiffs' proposed use might fall under this category. It is also possible that a gambling parlor featuring exotic dancing may well have been permitted. Overall, I conclude that there were ample alternative channels for plaintiffs to convey their desired message with its "emphasis on sexuality," Doc. #52-1 at 7, 32, at their location at 75 Ella Grasso Turnpike or elsewhere within the B-1 district.

Plaintiffs, however, argue that they are entitled under the Constitution not just to adequate places within town where adult businesses are not prohibited or to adequate manners in which they can express their chosen erotic message within those places, but to adequate places within town where there are no restrictions on the form or manner that their "adult" entertainment must take. They repeatedly complain that there was nowhere in Windsor Locks where adult businesses could locate "as of right," which they seem to think *Renton* requires. *See* Doc. #52 at 9-13. They also state that, in determining whether there are adequate alternative locations for operating adult businesses within a town, "locations which require conditional approval or some other form of special use permit not guaranteed of right by the relevant zoning code must . . . be discounted." Doc. #65 at 7.

I don't think so. Nothing in *Renton* or the First Amendment requires that plaintiffs have the right to conduct topless dancing "as of right" somewhere in the Town and without pre-condition. If adult establishments have the right to some location within a town where they may operate "as of right," and this right is violated by subjecting such establishments to general zoning rules, why isn't it similarly violated by subjecting them to parking regulations? How about fire safety regulations? It would be absurd to suggest that adult establishments must have somewhere within every municipality where they may operate "as of right" without regard to safety regulations. But how are the requirements of the general zoning code any different? Just like the parking and fire regulations, they require adult establishments to meet certain criteria unrelated to their adult character in order to operate. It would be anomalous to conclude that adult entertainment establishments enjoy a constitutional exemption from neutral laws of general applicability, when it is well settled that even houses of worship have no such right. *See Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).

Nor could plaintiffs' argument for a sweeping exception to all sorts of perfectly ordinary laws and regulations be limited just to adult-oriented businesses. At oral argument, plaintiffs suggested that the Windsor Locks ordinance could be fixed merely by adding adult entertainment to the zoning code as an enumerated permitted use. But why stop there? After all, adult businesses enjoy no uniquely heightened level of First Amendment protection. The Constitution protects a vast array of expressive activities, one whose scope virtually defies enumeration. Are newspaper companies to be constitutionally exempted—by a misguided application of the time, place, and manner doctrine—from having to apply for zoning permits if they wish to build a new building in which they will surely engage in First Amendment protected activities? Does the

same hold true for a comedy club? Or for an internet advertising company? Or for a bakery café that hosts a folk singer every Friday night? If *Renton* requires cities and towns to exempt adult businesses that engage in expressive activity, there is no reason to suppose why the same special treatment would not be equally required for any zoning applicant whose activities involve any other form of expressive activity that is protected under the First Amendment.

It is true, as plaintiffs' counsel pointed out at oral argument, that most of these other activities are not often featured in cases before the Supreme Court, while an entire line of cases have held adult entertainment subject to at least some First Amendment protection. This does not reflect, however, that adult entertainment enjoys some form of special constitutional protection. To the contrary, it is precisely because adult entertainment is thought to enjoy *weaker* protection than most expression that adult entertainment has generated so much Supreme Court litigation. The Court has said as much. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality opinion) ("nude dancing ... is expressive conduct, although ... it falls only within the outer ambit of the First Amendment's protection"); *Young*, 427 U.S. at 69 ("it is manifest that society's interest in protecting this kind of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment."); *see also TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 20-21 (2d Cir. 2010) (discussing how "adult entertainment establishments have played a disproportionately prominent role in First Amendment doctrine" and that the Supreme Court "has upheld adult entertainment zoning restrictions that would almost certainly be unconstitutional if applied to pure political speech").

Thus, if the Constitution requires that zoning codes expressly list adult entertainment as a permitted use that may exist somewhere within each municipality, it must also require similar enumeration in favor of every other form of expressive land use: political clubs and art galleries

and media companies and advertising companies and so on and so on. This is of course impossible. The First Amendment protects an essentially infinite range of expressive activity, and no town zoning code could list every possible variety. And if there were such a listing requirement, pity the beleaguered town that fails to list some category of First Amendment business, because the town would no doubt find itself on the wrong end of a lawsuit for impermissible content or viewpoint discrimination.

The practical effect of plaintiffs' rule would be a conclusion that garden-variety zoning codes of the kind at issue in this case—codes that sensibly enumerate easy-call permitted uses and allow other uses only through a discretionary permitting review process—are simply unconstitutional. Zoning codes would instead have to list only *forbidden* uses, leaving to the imagination a nebulous residual category of permitted uses that embrace the myriad forms of First Amendment-protected expressive land use. It is not clear how such a system could preserve any space for discretionary review by a zoning commission, even to ensure compliance with basics like fire safety and health regulations.

Now it might seem that zoning codes and other municipal safety regulations could still be applied to all *non*-expressive land use. Or at least the Eleventh Circuit thought so when it decided that a routine zoning ordinance could not be squared with the First Amendment. *See Lady J. Lingerie*, 176 F.3d at 1362 ("We only find troublesome the application of the otherwise-valid zoning criteria to adult businesses. . . ."). But let's be real. Once business owners learn that "expressive" land uses enjoy a proverbial EZPass exemption from the ordinary application of zoning and safety rules, the loophole will be subject to ready exploitation. Suppose every Walmart, Home Depot, and Exxon gas station decide to adorn their facades with the American flag to affirm patriotism as one of their business purposes. Surely a display of the star-and-stripes

is no less First Amendment-protected than erotic dancing. Are Walmart, Home Depot, and Exxon thereby exempt from zoning laws (or at least those zoning laws that are so callously unpatriotic that they don't bother to list "Buildings and Structures Used to Display the American Flag" as an express "permitted use")? If not, why should there be a special exemption from ordinary zoning and safety rules for boozy strip clubs?

At the very least the policing of this enormous loophole would involve an exhaustingly messy exercise in line-drawing. Quite likely it would not be possible to police the loophole without warping or narrowing the definition of expressive activity itself, and thereby inflicting real damage to the First Amendment.

I therefore reject plaintiffs' argument that the First Amendment requires the Town to provide some location where "as of right" they can operate an adult business. The Town's zoning code is a content-neutral time-place-and-manner regulation of land use that has reasonably specific criteria and that allows ample alternatives for First Amendment expression.[8] Accordingly, the zoning code satisfies all four elements of the time, place, and manner intermediate scrutiny test, and is constitutional.

### *Supplemental Jurisdiction*

Because plaintiffs' federal constitutional claim will be dismissed, I decline to exercise supplemental jurisdiction over the remaining state law claim for an administrative review of the denial of the permit. See 28 U.S.C. § 1367(c)(3); *see, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013). Especially because the parties have devoted very little briefing to this state law claim, I conclude that the exercise of continuing supplemental

---

[8] I do not further consider plaintiffs' as-applied challenges, because plaintiffs' counsel at oral argument abandoned any claim that the zoning code was applied in a pretextual manner in this case.

jurisdiction would not be appropriate in lieu of allowing the parties to resolve any remaining dispute before a Connecticut state court.

CONCLUSION

For the foregoing reasons, I GRANT defendants' motion for summary judgment (Doc. #54) with respect to plaintiffs' First Amendment claims, and DENY plaintiffs' motion for summary judgment (Doc. #52) on those claims. I otherwise DISMISS without prejudice plaintiffs' state law administrative appeal.

The Clerk of Court shall enter judgment for defendants and close the case.

It is so ordered.

Dated at New Haven this 18th day of September 2017.

*/s/ Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge